Filed 8/10/26  P. v. Davis CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B336424 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA157293) |
| v. | |
| KEYSHAWN DAVIS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge.  Affirmed.

Susan Morrow Maxwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Analee J. Brodie, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

A jury convicted defendant Keyshawn Davis of willful, deliberate, and premeditated attempted murder, assault with a firearm, and felony possession of a firearm.  The trial court sentenced Davis to a total term of 11 years and 8 months to life in prison.  On appeal, Davis contends:  (1) insufficient evidence supports the jury's finding that the attempted murder was willful, deliberate, and premeditated; (2) the court prejudicially erred when it excluded evidence of the victim's prior charged misconduct; and (3) the court violated Penal Code section 1170,[1] subdivision (b)(6), when it imposed the middle, as opposed to the low, term for some of his convictions.  Davis also argues that his trial counsel provided ineffective assistance at the sentencing hearing.  We reject each of Davis's contentions and affirm.

## FACTUAL BACKGROUND

### 1.    Prosecution evidence

Davis is a member of the 94 Hoovers gang.  At the time of the shooting in this case, the 94 Hoovers were feuding with the Neighborhood Crips, a predominantly African American gang associated with the color blue.

One afternoon in late April 2022, Davis was socializing with a group of people in front of an apartment complex on Denver Avenue in Los Angeles, which was in 94 Hoovers territory.  Davis left the group for a few minutes before returning with a gun.

Several minutes later, Lamar Jenkins, an African American male, drove his car down Denver Avenue towards the

---

[1]    All undesignated statutory references are to the Penal Code.

apartment complex where Davis was hanging out.  Jenkins, who was not a member of the Neighborhood Crips or any other gang, was wearing a blue jacket.  Jenkins did not have a gun or any other weapon inside his car.  Jenkins did not say anything to Davis or his group.  Surveillance footage shows Jenkins's car did not slow down or stop as it drove past the apartment complex.

As Jenkins drove past the complex, Davis ran into the street, pointed his gun at Jenkins's car, and fired several shots at it.  Jenkins sped down the street and made a right turn at the nearest intersection as Davis continued to run after him and fire several more shots at his car.  The police recovered nine .9 millimeter bullet casings at the scene of the shooting.

Davis was later arrested and interviewed by the police.  Davis initially denied knowing who was involved in the shooting, but he later admitted that he shot at Jenkins's car.  Davis told the police that he suffered from posttraumatic stress disorder (PTSD).  Davis had been shot at several times before, including the day before the shooting in this case.  He was carrying a gun on the day of the shooting because he was afraid of being shot.

According to Davis, Jenkins pulled his car next to the group that Davis was hanging out with and began "mad dogging" them.  Davis thought he saw Jenkins reach for a gun and "mumble[] something."  Davis was afraid that Jenkins would start shooting, so Davis ran into the street and fired several shots towards Jenkins's car.  Davis did not intend to hit Jenkins.  Instead, Davis claimed his PTSD caused him to black out during the shooting.  When the police asked Davis, "[w]hat if [Jenkins was] a square and he doesn't carry guns," Davis apologized and stated that he regretted what he did.

3

**2. Defense evidence**

Davis testified. He was 20 years old at the time of the shooting. He joined the 94 Hoovers because most of his family, including his mother, uncle, and cousins, were associated with the gang.

Davis's sister lived in the apartment complex where he was hanging out at the time of the shooting. The night before the shooting, Davis had someone hide the gun that he used to shoot at Jenkins's car near the backyard of his sister's apartment complex. Davis retrieved the gun on the day of the shooting because he was "nervous" and "trying to protect" himself. Davis was nervous because he had been shot at 20 times in the past, including during drive-by shootings. On one occasion, Davis was shot seven times.

After he was shot, Davis started to think "everybody is there wanting to shoot me and stuff like that." Davis was later diagnosed with PTSD and prescribed medication. Davis stopped taking the medication before the shooting in this case.

Davis described why he shot at Jenkins's car: "So I seen the car, and I seen the dude. He had one arm on the steering wheel and one hand, like, towards the center console. So I'm looking. I panic and I get nervous. I don't want him to shoot at me or shoot me or anything. So I'm like, okay, I'm just going to go after but not shoot the car. I will just shoot so I don't hit the car. Just scare him away. I didn't want to injure anybody. I didn't have any intent." Davis claimed that he did not notice that Jenkins was wearing the color blue. Davis only shot at Jenkins because he thought Jenkins was reaching for a gun as he drove past the apartment complex.

4

Davis testified that he drank alcohol and "did some crystal" before he shot at Jenkins's car. Davis felt "really" bad and remorseful for shooting at Jenkins's car, and he believed that he "should have been thinking and have a level head, but the drugs and the PTSD just don't mix."

Dr. Kory Knapke, a forensic psychiatrist, testified for the defense. Dr. Knapke evaluated Davis and reviewed the investigative materials from this case as well as Davis's medical and mental health records. According to Dr. Knapke, Davis was "pretty authentic and … sincere," and he was "remorseful" and "very up front about his previous criminal history." Dr. Knapke confirmed that Davis nearly died when he was shot "seven or eight times" in a previous drive-by shooting.

Dr. Knapke "strongly believe[d]" that Davis suffered from PTSD and a "very severe" substance abuse problem. According to Dr. Knapke, PTSD "is a diagnosis that occurs frequently in some individuals after they have experienced a severe trauma in which they have either been the victim of a severe trauma, or they have witnessed a severe trauma." People suffering from PTSD "develop severe anxiety symptoms to the point where they begin to have flashbacks in which they have memories and begin to almost relive the original trauma in their current day life." They also become "very angry" and "extremely impulsive at times for no apparent reason."

According to Dr. Knapke, Davis's family took Davis to a mental health facility a little over a month before the shooting in this case because he was "very out of control," "experiencing hallucinations," and talking about reliving "the original drive-by shooting." Davis was briefly admitted to the facility and prescribed medication to treat his symptoms.

5

Dr. Knapke discussed Davis's "extremely difficult" family history. Davis never knew his biological father, and his mother, who suffered from schizophrenia, died when he was very young. Davis was raised by his maternal great grandmother. Because he lacked a traditional "family structure," Davis turned to a "gang lifestyle," and his fellow gang members became his family growing up.

Dr. Knapke believed that Davis's exposure to a gang lifestyle from a young age caused him to develop "hypervigilance." Hypervigilance causes people to experience "so much anxiety and paranoia that they are frequently scanning their environment, they are looking over their shoulder, they are very guarded, they fear that they might be hurt in some way by other people." Dr. Knapke also believed that Davis was "labile," which causes a person to have "rapid shifting of emotions and behaviors that change very rapidly." Based on an interview with Davis and a review of the surveillance footage in this case, Dr. Knapke opined that Davis was under the influence of drugs and showing signs of hypervigilance and lability in the minutes leading up to the shooting.

When asked whether the way Davis shot at Jenkins's car was consistent with a person suffering from PTSD, Dr. Knapke responded, "Yes and no." According to Dr. Knapke, Davis reacted "very impulsive[ly]" when he saw Jenkins drive past the apartment complex. Unlike most people who suffer from PTSD, however, Davis did not "avoid people, places and things that remind [him] of the original trauma." Dr. Knapke believed it was a "weak point" in this case that Davis "was with his fellow gang bangers in front of this apartment complex, was not avoiding that type of situation and was out on the street." However, "the fact

6

that [Davis] impulsively fired at just a random stranger without any provocation whatsoever really points to the fact that he … most likely was very paranoid and was just very impulsive and was very agitated at the time of this incident."

On cross-examination, Dr. Knapke confirmed that Davis's failure to avoid triggering situations was a "weak point" in the doctor's diagnosis that Davis suffered from PTSD. When asked why Davis did not respond violently to every car that drove past the apartment complex on the day of the shooting, Dr. Knapke opined that Davis's reaction to Jenkins could have depended on whether Davis perceived Jenkins as being a gang member.

## PROCEDURAL BACKGROUND

In July 2023, the People filed an amended information charging Davis with willful, deliberate, and premeditated attempted murder (count 1), possession of a firearm with a prior violent conviction (count 2), and assault with a machine gun or assault weapon (count 3). As to counts 1 and 3, the People alleged that Davis personally used a firearm. As to all counts, the People alleged seven aggravating sentencing factors under California Rules of Court, rule 4.421. Before trial, the court dismissed count 3 and allowed the People to amend the information to allege count 4, assault with a semiautomatic firearm.

A jury convicted Davis of counts 1, 2, and 4. As to count 1, the jury found the attempted murder was willful, deliberate, and premeditated. As to counts 1 and 4, the jury found that Davis personally used a firearm during the commission of the offense. After Davis waived his right to a jury trial on the aggravating sentencing factors, the trial court found six of those factors true.

7

The trial court sentenced Davis to a total term of 11 years and 8 months to life in prison.[2]

Davis appeals.

## DISCUSSION

**1. Substantial evidence supports the jury's finding that the attempted murder was willful, deliberate, and premeditated**

Davis first challenges the sufficiency of the evidence to support his attempted murder conviction. He does not argue that insufficient evidence supports the jury's finding that he attempted to kill Jenkins. Instead, Davis contends that the People failed to prove that he committed the attempted murder willfully, deliberately, and with premeditation. As we explain, substantial evidence supports the jury's finding that the attempted murder was willful, deliberate, and premeditated.

### 1.1. Applicable law and standard of review

To establish a crime was willful, deliberate, and premeditated, the People must show more than an intent kill. (*People v. Solomon* (2010) 49 Cal.4th 792, 812.) Premeditated means " ' " ' "considered beforehand," ' " ' " and deliberate means " ' " ' "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88 (*Morales*).) An attempted killing is premeditated and deliberate if it was the result of preexisting thought and reflection rather than unconsidered or rash impulse.

---

[2] The court also found that Davis violated probation in a separate case, for which it imposed a consecutive three-year prison term.

8

(*Ibid*.) " ' "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*Ibid*.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), our Supreme Court identified " 'three basic categories' of evidence [that the] court has generally found sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, or 'facts about how and what [the] defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing'; (2) motive, or 'facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) manner of killing, or 'facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason." ' " (*Morales*, *supra*, 10 Cal.5th at pp. 88–89.)

The categories of evidence described in *Anderson* are not elements or the exclusive means of proving a crime was committed with premeditation and deliberation. (*Morales*, *supra*, 10 Cal.5th at p. 89.) Reviewing courts are not required to accord them any particular weight. (*Ibid*.) Rather, they provide " 'a framework to aid in appellate review.' " (*Ibid*.)

We review a jury's findings supporting a conviction for substantial evidence. We review the record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a reasonable jury could find the

9

defendant guilty beyond a reasonable doubt. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) We make all reasonable inferences in support of the judgment. (*Ibid.*) We do not reweigh the evidence or reevaluate the credibility of witnesses. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) If the evidence reasonably justifies the jury's findings, we will not reverse the judgment even if the evidence also supports a contrary finding. (*People v. Cravens* (2012) 53 Cal.4th 500, 508 (*Cravens*).)

### 1.2. Analysis

There was evidence of planning activity. Davis testified that the night before the shooting, he had someone stash a gun in the neighborhood where the shooting occurred. Shortly before the shooting, Davis retrieved the gun because he was nervous and wanted to protect himself. As our Supreme Court has explained, evidence that a defendant armed himself with a weapon before he initiated a violent encounter supports an inference that the defendant engaged in planning activity. (See *People v. Lee* (2011) 51 Cal.4th 620, 636; *People v. Elliot* (2005) 37 Cal.4th 453, 471.)

The manner of the shooting also supports a finding of premeditation and deliberation. Davis fired over seven shots at Jenkins as he drove away from the apartment complex. Firing multiple shots at "an unarmed and defenseless victim who posed no threat to [the defendant]—is entirely consistent" with a finding of premeditation and deliberation. (*People v. Silva* (2001) 25 Cal.4th 345, 369.)

Davis had multiple opportunities to reflect on whether to shoot, or to continue shooting, at Jenkins. The surveillance footage shows that Davis spotted Jenkins's car as it drove past the apartment complex. Davis then ran into the street to follow

10

Jenkins's car.  After taking several steps towards Jenkins's car, Davis raised his arm and fired several shots at the car.  At any time before he fired those shots, Davis could have decided not to follow Jenkins's car and shoot at it.  After firing the initial round of shots, Davis continued to run after Jenkins's car.  He even followed the car as it turned down a different street and fired several more shots at it.  Davis could have decided not to continue to follow Jenkins's car and fire several more shots at it as Jenkins fled the scene.  This evidence further supports a finding of premeditation and deliberation.  (*Morales*, *supra*, 10 Cal.5th at p. 88.)

The People also presented evidence that Davis had a motive to shoot Jenkins.  At the time of the shooting, Davis was a member of the 94 Hoovers, which was feuding with the Neighborhood Crips, a gang associated with the color blue and predominantly comprised of African American men.  The neighborhood where the shooting occurred was in 94 Hoovers territory.  The People's gang expert testified that gang members will try to protect their gang's territory by shooting at "anybody that they view as a rival gang member that is in their territory."  When he drove past the apartment complex where Davis was hanging out, Jenkins, an African American male, was wearing a blue sweatshirt.  Based on this evidence, the jury reasonably could infer that Davis shot at Jenkins because he thought Jenkins was a member of the Neighborhood Crips.  (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295.)

Davis argues that the jury's premeditation and deliberation finding must be reversed because the evidence supports a finding that he acted impulsively and without reflection when he shot at Jenkins.  Davis points to evidence that he was exhibiting

11

symptoms of PTSD, including hypervigilance and paranoia, in the moments leading up to the shooting. But the jury rejected Davis's argument that the shooting was the result of impulsive or rash behavior caused by his PTSD. Indeed, Dr. Knapke, Davis's expert witness, testified that some aspects of Davis's behavior before and during the shooting were not consistent with someone experiencing the symptoms of PTSD.

In any event, the fact that the evidence could support a finding that the shooting was not premeditated does not mean the jury's finding must be reversed. It is well settled that where, as here, the evidence reasonably justifies the jury's finding, we will not reverse that finding even if the evidence also supports a contrary finding. (*Cravens*, *supra*, 53 Cal.4th at p. 508.)

## 2. Any error in excluding evidence of Jenkins's criminal history was harmless

Davis next contends that the trial court abused its discretion when it excluded evidence that Jenkins was charged with carrying a loaded firearm in public in violation of section 25850. According to Davis, that evidence was relevant to impeach Jenkins's credibility because a violation of section 25850 is a crime of moral turpitude.

Before trial, Davis's attorney asked the trial court for permission to question witnesses about "whatever crimes of moral turpitude we can normally ask about." The People then moved to exclude Jenkins's criminal history under Evidence Code section 352. The prosecutor noted that Jenkins had "an open [section] 25850, which I believe is possession of unregistered firearm either concealed or in a vehicle … I believe he's being diverted on that." The trial court granted the People's motion because Jenkins had not been convicted of violating section 25850

12

and, in any event, it did not think the pending charge "necessarily reflects upon the witness's moral turpitude."

Parties may impeach witnesses with "any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931 (*Clark*).) When determining whether to admit evidence of prior misconduct, the court should consider, among other things, whether the misconduct reflects on the witness's honesty or veracity and whether the misconduct is near or remote in time. (*Ibid*.) "Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude." (*Id*. at pp. 931–932.)

Under Evidence Code section 352, a court has discretion to exclude or limit otherwise relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid*.) A trial court has broad discretion under Evidence Code section 352 to exclude even relevant impeachment evidence. (*Clark*, *supra*, 52 Cal.4th at p. 931.) We review a ruling that excludes evidence for abuse of discretion. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373.) We will reverse a trial court's order excluding evidence only when that order " 'is so irrational or arbitrary that no reasonable person could agree with it.' " (*People v. Clark* (2019) 43 Cal.App.5th 270, 292.)

13

At the outset, we note that at least one court has held that a violation of section 25850, the offense Jenkins was apparently charged with, qualifies as a crime of moral turpitude.  (See *People v. Bedolla* (2018) 28 Cal.App.5th 535, 552–556.)  However, we need not decide whether the trial court abused its discretion in prohibiting Davis from attempting to impeach Jenkins with evidence of that charge because any error was harmless under the standard established in *People v. Watson* (1956) 46 Cal.2d 818, 836–837.  Under that standard, the erroneous exclusion of impeachment evidence is harmless unless the defendant shows it is reasonably probable that he would have obtained a more favorable verdict but for the error.  (See *People v. Brooks* (2017) 3 Cal.5th 1, 52.)

The primary disputed issue in this case was Davis's mental state when he shot at Jenkins.  Davis testified that he shot at Jenkins because he felt threatened by the way he perceived Jenkins driving past the apartment complex.  Specifically, Davis testified that he saw Jenkins driving with one hand on the steering wheel and the other hand on the center console.  According to Davis, when people drive with that posture, it often means that a gun is near the center console and the driver has his hand near the gun.  Davis testified that due to his PTSD and paranoia from being shot several times during a prior incident, he likely would have shot at anyone who drove past him with that posture.  Davis claimed, however, that he shot towards Jenkins's car only to scare Jenkins, not to kill or otherwise injure him.  Dr. Knapke, Davis's own witness, testified that Davis shot at a "random stranger without any provocation whatsoever."

During closing argument, defense counsel asked the jury to find Davis guilty of attempted voluntary manslaughter under an

14

imperfect self-defense theory. Defense counsel argued that while Davis subjectively believed Jenkins posed a threat when he drove past the apartment complex, that belief was unreasonable. Defense counsel also argued that Davis did not act with premeditation and deliberation because the shooting was the result of impulsive, rash, and paranoid decisionmaking caused by his PTSD, and Davis shot towards Jenkins's car only to scare Jenkins, not to kill or injure him.

Nothing about Jenkins's testimony contradicted Davis's theory of the case. Jenkins was never questioned about whether he had one hand on the steering wheel and the other hand on the center console of his car as he drove past the apartment complex. Jenkins testified that he was never a member of any gangs and that when he drove past the apartment complex, he was wearing a blue sweatshirt, he did not have a gun, he did not make any threatening gestures or comments, he did not have any prior disputes with Davis, and he did not stop or slow down his car. Surveillance footage corroborated the last portion of Jenkins's testimony, as it showed his car drive past the apartment complex without slowing down or stopping. In addition, neither Davis nor any witness testified that Jenkins was a gang member, that Jenkins was armed or otherwise had a gun in his car, that Davis had any prior disputes with Jenkins, or that Jenkins made any threatening remarks or gestures as he drove past the apartment complex.

In short, the primary issue in this case—Davis's mental state when he shot at Jenkins—did not turn on the credibility of Jenkins's testimony. Indeed, Jenkins's testimony was consistent with Davis's theory of imperfect self-defense—i.e., that Davis overreacted to Jenkins driving past the apartment complex and

15

fired at him without provocation.  It is not reasonably probable, therefore, that Davis would have obtained a more favorable result had he been allowed to impeach Jenkins with evidence that Jenkins had been charged with a violation of section 25850.

**3.  The trial court did not abuse its discretion when it imposed a middle term sentence**

Davis next contends that the trial court abused its discretion under section 1170, subdivision (b)(6), when it did not impose low terms for counts 2 and 4.  He first argues that nothing in the record indicates that the trial court was aware of, or otherwise considered, the low term presumption before it sentenced him.  To the extent the court did consider section 1170, subdivision (b)(6), Davis argues it abused its discretion when it imposed the middle, and not the low, terms for counts 2 and 4.  As we explain, these arguments lack merit.

**3.1.  Applicable law and standard of review**

Effective January 1, 2022, Senate Bill No. 567 (2021–2022 Reg. Sess.) amended section 1170, subdivision (b)(6), which now provides that courts shall impose the low term if, among other things, the defendant was a youth as defined in section 1016.7, subdivision (b), when he committed the underlying offense or has experienced psychological, physical, or childhood trauma, and that his youth or experienced trauma was a contributing factor in the commission of the underlying offense.  (§ 1170, subd. (b)(6).)  The court may impose a sentence higher than the lower term if it "finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice."  (*Ibid*.)  "[T]he mere fact a defendant is young or has suffered past trauma is insufficient—either or both must be 'a contributing factor in the

16

commission of the offense' for the low term presumption to apply." (*People v. Knowles* (2024) 105 Cal.App.5th 757, 765 (*Knowles*).)

We review a trial court's sentencing decisions for abuse of discretion. (*Knowles*, *supra*, 105 Cal.App.5th at p. 764.) The court generally has wide discretion to select an appropriate sentence while weighing aggravating and mitigating factors. (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582.) A court abuses its discretion when it acts arbitrarily and capriciously, relies on improper matters, or is unaware of the scope of its discretion such that it does not exercise its discretion at all. (*Knowles*, at p. 765.)

When reviewing a trial court's sentencing decision, we presume the court considered all relevant laws and factors. (*Knowles*, *supra,* 105 Cal.App.5th at p. 765.) The party challenging the sentence carries the burden " ' "to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 376–377.)

### 3.2.   Relevant background

After trial, the People filed a sentencing memorandum. Relevant here, the People pointed out that under section 1170, subdivision (b)(6), the trial court was required to impose the low term if any of the factors listed in that statute contributed to the commission of Davis's offenses, unless the court found that the aggravating circumstances outweighed the mitigating circumstances such that imposition of the low term would be

17

contrary to the interests of justice.  The People also pointed out that Davis was defined as a youth for purposes of the statute at the time he committed the underlying offenses.  The People argued that the aggravating circumstances outweighed any mitigating circumstances such that imposition of the low term would be contrary to the interests of justice.

In December 2023, the trial court held the sentencing hearing.  At the outset, the court conducted a bench trial on the aggravating sentencing factors.  The court took judicial notice of the evidence that was admitted at trial.  The court found true the following aggravating sentencing factors:  (1) the crimes involved great violence and threat of bodily harm (Cal. Rules of Court, rule 4.421(a)(1)); (2) Davis was armed with a weapon during the commission of the crimes (Cal. Rules of Court, rule 4.421(a)(2)); (3) Davis engaged in violent conduct (Cal. Rules of Court, rule 4.421(b)(1)); (4) Davis suffered a prior conviction (Cal. Rules of Court, rule 4.421(b)(2)); (5) Davis committed the crimes while on probation (Cal. Rules of Court, rule 4.421(b)(4)); and (6) Davis's performance on probation was unsatisfactory (Cal. Rules of Court, rule 4.421(b)(5)).

The trial court then proceeded to sentencing.  The court stated that it read the People's sentencing memorandum, considered the parties' arguments, and considered the pre-plea probation report.  The court explained it had presided over the entire trial and considered all the aggravating sentencing factors that it earlier found true.  The court noted that Davis engaged in violent conduct by firing his gun multiple times at an occupied vehicle and that Jenkins was fortunate that he was not struck by any of the bullets.  The court stated that it did not intend to

18

impose the "how term,"[3] but that it had considered "the points that counsel has raised."

As to count 1, the trial court sentenced Davis to seven years to life for attempted murder, plus the middle term of four years for the firearm enhancement. For count 2, the court sentenced Davis to a consecutive eight-month term, or one-third of the middle term for that count. As to count 4, the court imposed but stayed under section 654 a total term of 10 years, consisting of the middle term of six years for assault with a semiautomatic firearm plus the middle term of four years for the firearm enhancement.

### 3.3. The trial court did not abuse its discretion when it imposed middle terms for Davis's convictions

At the outset, we reject Davis's argument that the trial court abused its discretion by failing to consider the low term presumption under section 1170, subdivision (b). Although the trial court did not expressly reference the presumption or the factors that trigger it, such as Davis's youth or the childhood and psychological trauma that he suffered before he committed the crimes in this case, nothing in the record shows that the court was unaware of, or failed to apply, the presumption. Indeed, by the time the court held the sentencing hearing in this case, the low term presumption had been in effect for nearly two years. Unless the record shows otherwise, we generally presume the

---

[3] There are numerous typos in the reporter's transcript from the sentencing hearing. While stating why it selected the middle term, the court stated it "would not impose the *how* term." (Italics added.) As we explain below, the context surrounding this quote indicates that the court stated, or intended to state, that it would not impose the low term.

19

trial court was aware of applicable law when it sentences the defendant.  (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.)

Other parts of the record indicate the trial court considered the low term presumption.  For instance, when it pronounced Davis's sentence, the court stated that it did not intend to "impose the *how* term," but it was "listening and considering the points that counsel has raised."  (Italics added.)  As we noted above, the reporter's transcript from the sentencing hearing contains numerous typos.  Based on the context in which the court stated that it did not intend to impose the "how term," it appears the court actually said, or at least intended to say, that it did not intend to impose the *low* term.  Indeed, immediately before it made this statement, the court discussed the violent nature of the offenses in this case and other aggravating sentencing factors, and it then explained that instead of imposing a "how term," it was imposing middle terms for the firearm enhancements and the substantive offenses in counts 2 and 4.  (See § 1170, subd. (b)(6) [court may impose middle, as opposed to low, term if it finds that the "aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice"].)

In addition, the People cited to section 1170, subdivision (b)(6), and discussed the low term presumption in their sentencing memorandum.  The People also pointed out that at least one of the triggering mitigating factors—i.e., Davis's youth—was present in this case.  Before it pronounced Davis's sentence, the court stated that it read the People's sentencing memorandum.  This further indicates that the court was aware of, and applied, the low term presumption under section 1170, subdivision (b)(6), when it sentenced Davis.  Because the record

20

does not affirmatively show that the trial court was unaware of its obligation to consider the low term presumption, we must presume that the court considered that presumption and found the low term was not appropriate under section 1170, subdivision (b)(6) when it sentenced Davis. (*Knowles*, *supra*, 105 Cal.App.5th at p. 765.)

We also conclude that the trial court did not abuse its discretion when it decided not to impose any low terms. To be sure, Davis presented evidence that he suffered childhood trauma and was only 20 years old when he committed the offenses in this case. (See § 1170, subd. (b)(6).) Davis also presented evidence that he suffered from PTSD when he committed those offenses. (*Ibid*.) Nevertheless, the record supports the trial court's decision to impose middle, as opposed to low, terms for Davis's convictions.

The court found true six aggravating sentencing factors in this case, including that the crimes involved great violence and the threat of bodily harm and that Davis was armed with a weapon during the commission of the underlying offenses. The court also found that Davis had committed several crimes while on probation and that his performance on probation was unsatisfactory. When the court explained its sentencing decision, it discussed the violent and dangerous nature of the offense, noting that Davis fired a gun multiple times at an occupied vehicle and that Jenkins was fortunate that he was not struck by the shots. On this record, the trial court reasonably could have found that the aggravating factors outweighed any mitigating circumstances such that imposing a low term sentence would be contrary to the interests of justice. We therefore cannot conclude

21

the court abused its discretion when it decided not to impose a low term sentence.

**4.     Claims of ineffective assistance of counsel**

A different attorney represented Davis at sentencing than the one who represented him at trial.  Davis argues the attorney who represented him at sentencing provided ineffective assistance because the attorney appeared not to have reviewed evidence about Davis's childhood trauma and mental health issues before the sentencing hearing, did not argue for imposition of a low term sentence, did not inform the court of its obligations under section 1170, subdivision (b)(6), and did not remind the court to schedule a hearing under *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).  For the reasons discussed below, we reject Davis's claims of ineffective assistance of counsel.

**4.1.     Relevant legal principles**

"To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial." (*People v. Scott* (1997) 15 Cal.4th 1188, 1211 (*Scott*); *Strickland v. Washington* (1984) 466 U.S. 668, 687.)  Courts defer to an attorney's reasonable tactical decisions and presume that the attorney acted within the wide range of reasonable professional assistance.  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  On direct appeal, an attorney's performance will be found to be deficient "only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Ibid*.)

22

Prejudice is shown when there is a reasonable probability that but for counsel's error or omission the result of the proceeding would have been different. " 'A reasonable probability is [one] … sufficient to undermine confidence in the outcome.' " (*Scott*, *supra*, 15 Cal.4th at pp. 1211–1212.) "It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different." (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.)

### 4.2. Failure to argue for imposition of a low term sentence

Even assuming the attorney who represented Davis at sentencing provided deficient assistance by failing to argue for imposition of a low term sentence, Davis cannot show that performance was prejudicial. As we discussed above, the trial court acknowledged at sentencing that it had presided over trial and was familiar with the evidence, and that it reviewed the People's sentencing memoranda. As we already explained, nothing in the record suggests that the court was not aware of the low term presumption and did not apply it before sentencing Davis. Further, the trial court found true six aggravating sentencing factors, and it noted the serious and violent nature of the offenses when it explained why it was imposing middle terms. Davis points to no new mitigating evidence that his attorney could have presented that would have made it more likely for the court to impose a low term sentence. Davis has, therefore, not shown it is reasonably probable that he would have received a more favorable outcome had his attorney argued for imposition of

23

a low term sentence or otherwise objected to imposition of a middle term sentence.

### 4.3. Failure to remind the trial court to schedule a *Franklin* hearing

Shortly after the jury gave its verdict and was excused, the trial court and counsel for both parties discussed scheduling a bench trial on the aggravating sentencing factors and the sentencing hearing.  The attorney who represented Davis throughout trial (but not at the sentencing hearing) told the court, "this is one where I think I have to do a *Franklin*."  After Davis's attorney asked the court if it agreed, the court responded, "Yes.  You should have that opportunity, yes."  Davis's attorney then asked the court to schedule sentencing and a *Franklin* hearing for late September 2023, if the attorney was "ready with the *Franklin* by then."

The court and the parties never discussed again whether Davis was entitled to a *Franklin* hearing, and the court never held such a hearing.  Davis now argues that the attorney who represented him at the sentencing hearing provided deficient assistance by failing to "remind the court to set a date for the *Franklin* hearing."

Section 3051, subdivision (a)(1), provides for a "youth offender parole hearing" by the Board of Parole Hearings "for the purpose of reviewing the parole suitability of any prisoner who was 25 years of age or younger … at the time of the controlling offense."  If the defendant, like Davis in this case, is convicted of a controlling offense "when the person was 25 years of age or younger and for which the sentence is a life term of less than 25 years to life," that person "shall be eligible for release on parole at a youth offender parole hearing during the person's 20th year of

incarceration.  The youth parole eligible date for a person eligible for a youth offender parole hearing under this paragraph shall be the first day of the person's 20th year of incarceration."  (*Id.*, subd. (b)(2).)

A *Franklin* hearing "provides the parties an opportunity 'to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to "give great weight to" youth-related factors [citation] in determining whether the offender is "fit to rejoin society" despite having committed a serious crime "while he was a child in the eyes of the law." ' [Citation.]  For youth offenders, the Board … must consider youth-related factors at all parole hearings, not just youth offender parole hearings."  (*People v. Howard* (2021) 74 Cal.App.5th 141, 147.)

The record does not show why the attorney who represented Davis at sentencing did not remind the trial court to schedule a *Franklin* hearing.  The attorney could have reviewed the record prior to the sentencing hearing and determined that there was no new, noncumulative evidence of mitigating "youth-related factors" that would "meaningfully add[] to the already available record."  (*In re Cook* (2019) 7 Cal.5th 439, 459; see also *ibid.* ["the trial court may 'exercise its discretion to conduct [the *Franklin*] process efficiently, ensuring that the information introduced is relevant, noncumulative, and otherwise in accord with the governing rules, statutes, and regulations' "].)  Indeed, Davis does not assert that his attorney could have presented any noncumulative evidence relevant to youth-related factors at a *Franklin* hearing.  Because Davis has not pointed to any "affirmative evidence that counsel could have had 'no rational

25

tactical purpose' " for not reminding the court to schedule a *Franklin* hearing, Davis "has not demonstrated constitutionally deficient performance on this record."  (*People v. Mickel* (2016) 2 Cal.5th 181, 200.)

## DISPOSITION

The judgment is affirmed.


VIRAMONTES, J.


WE CONCUR:


WILEY, Acting P. J.


SCHERB, J.